DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**LISANDRA GONZALEZ,**
Appellant,

v.

**SARAI LORRAINE FUNES,**
Appellee.

No. 4D19-3180

[July 29, 2020]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Stefanie Moon, Judge; L.T. Case No. DVCE 19-006982.

Lisandra Gonzalez, Hallandale Beach, pro se.

No appearance for appellee.

KLINGENSMITH, J.

A soured business deal set against the backdrop of a love triangle put in motion the events that led to Petitioner Sarai Lorraine Funes obtaining a final judgment of injunction for protection against stalking against Respondent Lisandra Gonzalez. In her petition, Funes made four allegations of incidents that occurred over a two-month timeframe. Because those incidents, as alleged by Funes, do not qualify for protection by way of injunction under the stalking statute, we reverse.

The parties, Gonzalez and Funes, first met in 2017 when Funes was dating Alexis Fortun. Gonzalez lived across the street from Fortun's aunt in Hallandale Beach, whom Fortun visited frequently. In 2019, after Fortun and Funes ended their relationship, Fortun and Gonzalez began dating. While Gonzalez and Fortun were still dating, Fortun and Funes entered into a business relationship to purchase property. Gonzalez's concern with this real estate deal prompted a series of incidents between her and Funes, and ultimately led Funes to petition for a stalking injunction against Gonzalez.

In her petition, Funes alleged the following: (1) she asked Gonzalez to stop calling and sending her text messages; (2) Gonzalez went to her place

of employment and accused her of money laundering; (3) Gonzalez called her and sent insulting text messages; and (4) Gonzalez once took pictures of her vehicle and license plate. Funes also claimed that Gonzalez threatened her both in a phone call and in a text message, telling her that if she ever visited Fortun's aunt's house again, she "wouldn't see the end of it or . . . live to tell the story."

Gonzalez responded to those allegations by petitioning for an injunction of her own against Funes. Gonzalez described Funes' petition as another attempt to cause problems in her relationship with Fortun. To Gonzalez, an insurance and investment professional, the real estate transaction between Funes and Fortun looked "very shady and weird." Gonzalez said she did not want her boyfriend to be involved in such an arrangement, so she contacted Funes to discuss it. When Funes did not respond, Gonzalez visited Funes' office and requested to speak to the broker primarily in charge of the deal. Gonzalez also claimed that contrary to Funes' allegation, it was Funes who initiated contact with Gonzalez by texting her "out of the blue" on her personal phone, Facebook Messenger, and WhatsApp about personal matters. Gonzalez also stated that both she and Fortun had asked Funes to "keep away" from the Hallandale Beach neighborhood, but that Funes nonetheless kept visiting. As it pertained to the claim that Gonzalez took a photo of Funes' car, Gonzalez admitted doing so, but said that she did it to get proof that Funes was continuing her neighborhood visits after being told to stay away.

After hearing this evidence at the final injunction hearing, the court granted Funes' petition but denied Gonzalez's counter-petition. This appeal followed.[1]

"A trial court has broad discretion to grant an injunction, and [this court] review[s] an order imposing a permanent injunction for a clear abuse of that discretion. *Pickett v. Copeland*, 236 So. 3d 1142, 1143–44 (Fla. 1st DCA 2018). However, "the question of whether the evidence is legally sufficient to justify imposing an injunction is a question of law that [this court] review[s] de novo." *Id.* at 1144.

Section 784.0485(1), Florida Statutes (2019), "create[s] a cause of action for an injunction for protection against stalking[.]" Section 784.048(2), Florida Statutes (2019), states that stalking occurs when: "[a] person . . . willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person[.]" The statute defines "harass," as "engag[ing]

---

[1] Gonzalez does not appeal the denial of her counter-petition for an injunction against Funes.

in a course of conduct directed at a specific person which causes *substantial emotional distress* to that person *and serves no legitimate purpose.*"  § 784.048(1)(a), Fla. Stat. (2019) (emphases added).  In turn, the statute defines a "course of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose."  § 784.048(1)(b), Fla. Stat. (2019).

A.  Whether Gonzalez's conduct "serve[d] a legitimate purpose."

As stated above, to constitute harassment a person must engage in conduct that "serves no legitimate purpose."  § 784.048(1)(a), Fla. Stat. (2019).  When answering the question of whether conduct serves a legitimate purpose, courts consider "a wide variety of conduct."  *David v. Textor*, 189 So. 3d 871, 875 (Fla. 4th DCA 2016).  Conduct is "legitimate when there is a reason for the [conduct] other than to harass the victim." *O'Neill v. Goodwin*, 195 So. 3d 411, 413 (Fla. 4th DCA 2016).

For insight into how courts view allegations of stalking that arise from a love triangle, the case of *Leach v. Kersey*, 162 So. 3d 1104 (Fla. 2d DCA 2015), is instructive.  There, the alleged victim, Tara Michelle Kersey, had an eighteen-month affair with Melissa Leach's husband, Dr. Leach.  *Id.* at 1106.  After Leach learned of the affair, she contacted Kersey by phone, through friends, and on social media, telling her to stay away from Dr. Leach.  *Id.*  Leach also posted a message on a public blog calling Kersey a "Homewrecker."  *Id.* at 1107.  Kersey then petitioned for an injunction for protection against stalking, which the trial court granted after a hearing. *Id.*

On appeal, the Second District reversed.  *Id.* at 1106-07.  The court found that Leach's contacts to Kersey were made for the legitimate purpose of telling Kersey to "stay away" from her husband.  *Id.* at 1106.  Further legitimizing the contacts, the Second District noted that Leach made her contact in response to discovering an attempt by Kersey to contact her husband.  *Id.*  Additionally, the court found that Leach's contacts would not cause a reasonable person in Kersey's circumstances to suffer substantial emotional distress, stating that "[a] reasonable woman who had an eighteen-month affair with another woman's husband might well expect to hear the scorn of an angry wife." *Id.*

We find that given the context in which they occurred, Gonzalez's contacts in this case all served legitimate purposes.  Here, the issues between Gonzalez and Funes came to the forefront shortly after Gonzalez started dating Fortun, who was Funes' ex-boyfriend.  The first spat between the parties apparently arose because of the real estate transaction

between Funes and Fortun. When Gonzalez, herself a mortgage loan originator, heard details of the transaction from Fortun, she immediately thought that it was "shady" and did not want her boyfriend to be a part of it. As a result, Gonzalez attempted to reach out to Funes to inform her that she believed the transaction was not proper. The evidence submitted at the hearing showed that Gonzalez sent the subject messages to Funes to offer her advice on the transaction since Gonzalez had experience with real estate transactions, and this particular transaction was of interest to her because her boyfriend Fortun, was involved. Thus, Gonzalez's communications to Funes regarding the real estate transaction served a legitimate purpose. *See Touhey v. Seda*, 133 So. 3d 1203, 1205 (Fla. 2d DCA 2014) (stating that communications regarding a dispute over the dissolution of a business served a legitimate purpose).

Gonzalez's visit to Funes' employer also served a legitimate purpose. Because of Gonzalez's background, she knew that a head broker is responsible for the actions of the brokers that work under them. Thus, Gonzalez felt that she should inform Funes' brokerage firm of Funes' suspicious actions. Although Gonzalez may have had ulterior motives for contacting Funes' employer, her contact with them was not entirely bereft of a legitimate purpose. Gonzalez wanted to alert them to the possibility of an illicit transaction which one of their brokers was engaging in; Gonzalez also had a particular interest, i.e., protecting her boyfriend. *See O'Neill*, 195 So. 3d at 413 (stating that conduct is legitimate when there is a reason for it other than harassment).

Gonzalez's messages and calls to Funes also served the legitimate purpose of telling her to "stay away" from Fortun. *See Leach*, 162 So. 3d at 1106. Given the previous relationship between Funes and Fortun, Gonzalez was concerned that Funes would interfere with her relationship with Fortun. These concerns were certainly amplified when Gonzalez noticed text messages from Funes to Fortun stating that she was still in love with him.

The fact that Gonzalez took pictures of Funes' vehicle and license plate was also not entirely devoid of a legitimate purpose. When Gonzalez took these pictures, the parties previously had a falling out and each told the other not to contact them. Gonzalez then became increasingly concerned about the amount of time Funes spent with Fortun and his family and had told Fortun to tell Funes to stay away. Despite this, Funes still frequented Fortun's aunt's house, which was in the same neighborhood where Gonzalez lived. Seeing Funes' car across the street, Gonzalez took a picture of the car to provide proof to Fortun that Funes was still coming to the neighborhood despite being asked to stay away. While Funes claimed

4

that she was only in the neighborhood because she was a close family friend and was providing medical help in her other role as a licensed nurse, this does not negate the fact that Gonzalez had a legitimate purpose for taking the pictures. *See Textor*, 189 So. 3d at 875 (stating that "a wide variety of conduct" will be considered legitimate).

B. Whether Gonzalez's actions caused Funes "substantial emotional distress."

To constitute harassment, the perpetrator's actions must cause the victim "substantial emotional distress." § 784.048(1)(a), Fla. Stat. (2019). "For determining whether an incident [causes] substantial emotional distress, courts must use a reasonable person standard, not a subjective standard." *McMath v. Biernacki*, 776 So. 2d 1039, 1040 (Fla. 1st DCA 2001). Thus, the question is not "was the victim in tears and terrified," but rather, "would a reasonable person be put in distress when subjected to such conduct?" *D.L.D. v. State*, 815 So. 2d 746, 748 (Fla. 5th DCA 2002).

In another case involving a love triangle, *Jones v. Jackson*, 67 So. 3d 1203 (Fla. 2d DCA 2011), Micah Jones was living with Lawrence Jackson's "soon-to-be ex-wife," and the two men frequently got into spats. *Id.* at 1204 (Altenbernd, J., concurring). According to Jackson, Jones sent him threatening phone calls and text messages. *Id.* at 1203-04. Jackson also stated that Jones made statements to third parties suggesting that he would "do violence" to him. *Id.* at 1204. Jackson petitioned for an injunction and the trial court granted it after a hearing. *Id.*

On appeal, the Second District reversed this injunction as well. *Id.* The Second District stated that the threats Jackson received would not have caused a reasonable person substantial emotional distress. *Id.* The court also noted that the only evidence about Jackson's emotional response was that he was calm after receiving one of Jones' threats. *Id.* In his concurrence, Judge Altenbernd noted that although it seemed like Jackson was tired of Jones' "profanity and idle verbal threats," Jackson did not actually fear that Jones would act on them. *Id.* at 1204 (Altenbernd, J., concurring).

Like in *Jones*, we find that Gonzalez's actions would not have caused a reasonable person in Funes' position substantial emotional distress. At the injunction hearing, Funes alleged that she was scared of Gonzalez because of her "erratic behavior." By this, Funes' was presumably referring to Gonzalez's messages, phone calls, visit to her place of employment, and threat that Funes "wouldn't see the end of it or . . . live

5

to tell the story" if she visited Fortun or his family again. However, as stated above, Gonzalez's messages, phone calls, and visit to her place of employment all had legitimate purposes. There was also no evidence to show that Funes actually feared that Gonzalez would act on the alleged one-time threat. It is also important to note that when Gonzalez made this alleged threat to Funes regarding her contacts with Fortun, Gonzalez was dating Fortun. A reasonable person in Funes' situation should expect to receive a degree of "scorn" as a result of continuing to inject herself into the life of an ex-boyfriend. *See Leach*, 162 So. 3d at 1106. Further, Gonzalez's disdain for Funes was likely amplified because Funes continued to send her ex-boyfriend text messages stating that she still loved him. *See id.*; *see also Ashford-Cooper v. Ruff*, 230 So. 3d 1283, 1283 (Fla. 1st DCA 2017) (stating that a wife's repeated calls and text messages to her husband's paramour would not cause a reasonable person in the paramour's position substantial emotional distress).

Considering all the evidence in this case, it appears that the primary purpose for the trial court's entry of this injunction was simply as a means "to keep the peace" between the parties. *See Klemple v. Gagliano*, 197 So. 3d 1283, 1286 (Fla. 4th DCA 2016). However, we have previously cautioned that the injunction statute should not be used in this manner. *Id.* As Judge Altenbernd stated in *Jones*, the best solution to the issues in this case would be for Gonzalez and Funes to "leave one another alone." *Jones*, 67 So. 3d at 1204 (Altenbernd, J., concurring). However, a court-ordered injunction is not the proper way to accomplish that laudable goal. We therefore reverse the injunction entered against Gonzalez in this matter.

*Reversed.*

CIKLIN, CONNER, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**

6